UNITED STATES of America,
Plaintiff–Appellee,

v.

Reid SIMPSON, Defendant–Appellant.

No. 92–2351.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 15, 1993.

Decided May 28, 1993.

Bradley W. Murphy, Asst. U.S. Atty., Peoria, IL, (argued), for U.S.

Ronald Hamm, Hamm & Hanna, Peoria, IL, (argued), for defendant-appellant.

Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

At the heart of this case lies a mystery: who is Gene Greene? A jury convicted Reid Simpson of filing false insurance forms with the United States Department of Agriculture (USDA), and he claims that Gene Greene of the General Accounting Office (GAO) put him up to it as part of a covert effort to expose the potential for fraud and abuse in USDA farm insurance programs. Simpson argues on appeal that his defense of entrapment entitled him to an acquittal, that venue in the Central District of Illinois was improper, and that the trial judge erred in computing his sentence. Simpson's story of Gene Greene is intriguing, but the jury rejected it and we must affirm Simpson's conviction. We remand for resentencing because, as conceded by the government at oral argument, the district court made an error when it calculated Simpson's sentence under the Guidelines.

Simpson works as a farmer and insurance broker in El Paso, Illinois. He wrote and serviced crop insurance policies for USDA at a time when it began to reimburse farm losses by contracting with private reinsurance companies rather than by paying farmers directly. Simpson claims that on several occasions he publicly criticized privatization of crop insurance as wasteful and prone to abuse. Simpson also claims that beginning in late March of 1989 he received a series of telephone calls from a Eugene Greene of the

GAO. According to Simpson's account of their conversations, Greene was familiar with Simpson's views on federal crop insurance, and he asked Simpson to submit a phony reinsurance claim so that GAO could document failings in USDA's crop insurance procedures. In return, Greene promised Simpson immunity from prosecution and payment for any expenses Simpson might incur if he were called to testify. Although initially Simpson was reluctant to help Greene, he agreed.

Also in late March of 1989, Simpson signed an agency agreement with American Agrisurance, an Iowa crop reinsurance company, that allowed him to file crop insurance applications with American until April 15, 1989, when the company stopped issuing policies until the next growing season. Over the next few weeks Simpson submitted several crop insurance applications to American. Two of these were fraudulent applications made out for a non-existent "RADBR farms" and signed by Simpson; RADBR was a name Simpson made up using the first initials of his family. American issued an insurance policy for RADBR seed corn plots shortly after receiving the application even though Simpson failed to supply certain required information about RADBR and its owners and sent the applications in after the April 15th deadline. To support his policy, Simpson sent American wildly exaggerated acreage reports on the make-believe RADBR plots. He began using the name "Gene Greene," and he testified that he inserted purposeful errors in all the policy materials he sent to American so that there was no danger the claims would actually be paid. In December 1989, Simpson filed with American a notice of loss on the fictitious crops totaling $838,900. In January a claims adjuster for American worked with Simpson to prepare the documents that had to be assembled before any claim would be paid. Simpson never supplied certain critical documents, and on January 23, 1990, Simpson met with the agent to sign more forms, signing his name "Gene Greene."

In early February, a different agent for American, realizing something was amiss with the RADBR claim, called Simpson to ask who Gene Greene was. Simpson and the agent gave somewhat conflicting accounts of their conversation at trial. Simpson testified that he told the agent that he was working on a project for GAO to uncover insurance fraud, and that the agent hung up on him. According to the agent, Simpson said that he signed the RADBR claims in Greene's name and that he did not know how to contact Greene. Around the time American got wind of Simpson's fraud, Simpson began to make efforts to re-establish his alleged contact with Greene. He called GAO in January but found no record of a current or former employee named Gene Greene. He asked an acquaintance who sold insurance in Colorado for advice on how to reach Greene, but these leads turned to dead ends. He sought help from Congressman Madigan and Senator Dole's offices, to no avail. He recounted the story of Greene's phone calls to an investigator from the Inspector General's Office who made inquiries at four government agencies but failed to locate Greene. Finally, Simpson traveled to Washington on the eve of his trial and searched fruitlessly for Greene himself.

Had Greene vanished? Was he a malefactor who set Simpson up? Or was he Simpson's alter ego, an imaginary friend invented to take responsibility for misdeeds or for a misguided solo campaign to expose USDA insurance fraud? We cannot know whether such questions perplexed Simpson's jury, but in any event they found him guilty on four counts of submitting fraudulent insurance claims in a matter under USDA's jurisdiction in violation of 18 U.S.C. § 1001. On appeal Simpson urges us to find that he was entrapped as a matter of law. He argues that his unrebutted testimony showed that Greene induced him to commit his crime, that he never intended to defraud American of any money, and that he used irregular procedures when dealing with American to ensure that the phony claims would never be paid. He asserts that as an expert farm insurance broker, he never would have submitted error-ridden or exaggerated documents if he truly wished to defraud USDA, and he asks us to reconsider his story that he believed he was helping the government.

The elements and shifting burdens of an entrapment defense are well established in this Circuit. First, a defendant must show evidence that the government induced him to commit a crime and that he lacked the predisposition to commit the crime on his own. Once the defendant has done so, the burden shifts to the government to show beyond a reasonable doubt that there was no inducement or that the defendant was predisposed. *United States v. Fusko,* 869 F.2d 1048, 1052 (7th Cir.1989). Inducement and predisposition are questions for the trier of fact, and Simpson can prevail on appeal only if the government did not offer sufficient evidence to allow a rational trier of fact to conclude beyond a reasonable doubt that he was not induced by the government to commit his crime. *United States v. Blackman,* 950 F.2d 420, 422–423 (7th Cir. 1991).

Here, of course, there is plenty of evidence to conclude that Simpson was not induced to commit insurance fraud. Only Simpson's testimony supports Greene's existence. All other evidence, though inferential, suggests that Greene does not exist. The investigator from the Inspector General's Office failed to locate a government agent named Gene Greene. There is no evidence that GAO audited or otherwise reviewed USDA's crop insurance procedures. No one has been able to tender information on Greene's whereabouts. Finally, there is the improbable and alliterative quality of the missing witness' name: "Gene Greene"—like a farmer's alias, like "John Doe" dressed in overalls. We hold that a rational jury could find beyond a reasonable doubt that Greene did not exist and therefore did not induce Simpson to do anything. To hold otherwise would be to pronounce an exceedingly strange rule of criminal law. It would mean that all defendants could establish a valid entrapment defense by testifying, absent any corroborating evidence, that "Agent G. Mann of the FBI told me to commit this crime because it would help the FBI catch other criminals." This cannot be the law.

Simpson's argument that his conviction should be overturned because of improper venue is also unavailing. He raises this issue for the first time on appeal, and if a defendant does not object to a defect in venue before trial, his objection is waived. *United States v. Brown,* 739 F.2d 1136, 1148 (7th Cir.1984), certiorari denied, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268. Federal law provides that venue is proper in any district where an offense was begun, continued or completed. 18 U.S.C. § 3237(a); *United States v. Molt,* 772 F.2d 366, 369 (7th Cir.1985). Here Simpson began his offenses in El Paso, Illinois, and thus venue was proper in the Central District of Illinois.

Finally, Simpson urges us to reduce his sentence on a variety of grounds. First, he claims that Sentencing Guideline § 3E1.1 offers him a two-point reduction for acceptance of responsibility because he has admitted that he filed the false statements. The district court's finding that Simpson did not accept responsibility for his acts is a factual determination that we uphold unless it is clearly erroneous. 18 U.S.C. § 3742(d); *United States v. Jordan,* 890 F.2d 968, 972 (7th Cir.1989). As our previous discussion reveals, Simpson still asserts that Greene induced him to commit his crime. He has not accepted responsibility for his acts—he blames Greene. Where a defendant persists in asserting entrapment, she cannot also claim acceptance of responsibility. *United States v. Hansen,* 964 F.2d 1017, 1021 (10th Cir.1992).

Second, Simpson claims that when the trial judge sentenced him it erroneously determined the amount of loss for his crime to be $838,900. Simpson argues that the amount of loss was zero because his fraud never cost American any money. But Simpson was sentenced under Guideline § 2F1.1 for "Fraud and Deceit," and note seven to that guideline states "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it is larger than the actual loss." The district court correctly calculated Simpson's sentence based on intended loss rather than actual damages. *United States v. Johnson,* 908 F.2d 396, 398 (8th Cir.1990). For similar reasons, Simpson is not entitled to a three-point reduction under

Guideline § 2X1.1 on the theory that his offense was only "partially complete." He was convicted of filing false statements; the filing alone completed his offense under the statute. 18 U.S.C. § 1001.

■ The district court erred when it figured the amount of loss, however, in that it failed to deduct a $74,000 premium from the $838,900 false claims. If Simpson had seen his scheme through to payment, American would have deducted the premium from the amount of Simpson's claims. R. Vol. I at 77–79. As the government conceded at oral argument, the proper amount of loss was the amount of the claims minus the premium, or $764,900, which would result in an enhancement of ten points (more than $500,000 loss) rather than the eleven points (more than $800,000) imposed below. Guideline § 2F1.1(b)(1)(K–L). This clear error requires a remand so that the district judge may recalculate Simpson's sentence.

On appeal, at least, the story of Gene Greene does not read as though a wily criminal fabricated it to protest his innocence. Who would expect to be exonerated by such a tale, unless it were true or believed by the narrator? The jury decided that Gene Greene was a story and not a person, however, and for purposes of this opinion a story he remains. We affirm Simpson's conviction and remand his case for resentencing.