**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Larry E. REYNOLDS, Defendant–Appellant.**

**No. 94–3113.**

United States Court of Appeals, Seventh Circuit.

Argued June 9, 1995.

Decided Aug. 25, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 19, 1995.

Bernard L. Pylitt (argued), Katzman, Katzman & Pylitt, Indianapolis, IN, for defendant-appellant.

Larry A. Mackey, Asst. U.S. Atty. (argued), Sharon Jackson, Indianapolis, IN, for U.S.

Before CUMMINGS, CUDAHY and FLAUM, Circuit Judges.

CUMMINGS, Circuit Judge.

Larry Reynolds was convicted by a jury on 25 counts of a 26–count indictment.[1] Reynolds appeals several issues relating to his conviction and sentence. We affirm Reynolds' conviction and sentence, with the exception of the district court's order of restitution, which we vacate and remand with instructions.

## I. BACKGROUND

Larry Reynolds served as President of the United Mine Workers of America (UMWA) District 11 from 1976 until 1989. District 11, encompassing the state of Indiana, is an autonomous and self-governed district with its office in Terre Haute. District 11 conducts its own business affairs and collects monthly dues from its membership. Those dues are then supposed to be divided equally and distributed to the local UMWA, the International UMWA, and District 11's own operating expense account.

From July of 1980 until November of 1990, Carol Sue Stoner served as District 11's bookkeeper. She was responsible for depositing the checks into the "Dues Trust Fund" and making the proper distributions. Begin-

---

1. Reynolds was charged with conspiracy, theft, money laundering, destruction of records, violation of Racketeer Influenced and Corrupt Organizations Act ("RICO"), mail fraud, tax evasion, and making false statements to a federal agency.

ning in July of 1981 and continuing until 1990, Stoner deposited 356 checks totalling $495,505.42 drawn on the District 11 Trust Fund into her own account at the Sullivan–Peoples State Bank in Sullivan, Indiana. Stoner then altered the financial records so that the International UMWA would believe that District 11's income from dues was less than what it actually received and thus would not expect a larger share of the funds.

Stoner pled guilty to all the counts of the indictment against her and agreed to cooperate with the authorities in the prosecution of the other defendants, including Reynolds. Reynolds was the only defendant to proceed to trial. At trial Stoner admitted her involvement and testified that Reynolds instructed her to pay herself rather than write a check to the UMWA International. He also directed her to alter the District's records to avoid detection. Stoner indicated that she gave over $120,000 in cash of the stolen funds to Reynolds. In addition to these funds, Reynolds also obtained cash from checks written to third persons and fraudulently endorsed by him or his wife.

Reynolds was convicted by a jury of all but one of the charges and sentenced to 115 months of imprisonment and three years of supervised release. He was also ordered to pay $345,000 in restitution.

## II. DISCUSSION

### A. Motion for a New Trial

Reynolds claims he was denied a fair and impartial trial in violation of his Sixth Amendment rights. After the jury had returned its verdict, Reynolds' counsel moved for a new trial based upon a relationship between the prosecutor's sister and one of the jurors. The court held a hearing and denied the motion, finding that "there is no reasonable possibility that these conversations and relationships affected the verdicts."

The facts surrounding this situation bear some explanation. Ninety prospective jurors were sent a questionnaire and asked to complete it before jury selection on February 22, 1994. Prospective juror Sandra Pineda then appeared on February 22nd, when prospective jurors were questioned by counsel and the court. Juror Pineda indicated that she was employed by Bristol Myers. After introducing herself, Assistant United States Attorney (AUSA) Larry Mackey and two agents, AUSA Sharon Jackson asked Pineda's panel: "Do any of your [sic] know us? Have you seen us before or anything like that?" No prospective juror responded.

AUSA Mackey prosecuted the case with AUSA Jackson. Mackey's sister, Judy Hall, was present at the Reynolds trial for opening statements and the cross-examination of the defendant. Hall works at Bristol Myers and is acquainted with Pineda. In fact, when Pineda received her summons, she told Hall about it. Hall responded that her brother worked at the court and that he would probably be handling the case. On her second visit to the trial, Hall waved at Pineda as the jurors entered the courtroom. She also met Pineda outside the restroom unexpectedly. The two discussed that Pineda had been ill for most of the trial, as had Pineda's daughter. They briefly discussed Pineda's absence from work. The trial was not discussed at all.

Defense counsel learned that a juror (Pineda) had been seen talking to the woman in the front row of the gallery during a break. He asked Mackey if he knew the woman. Mackey told him that she was his sister, Judy Hall, and introduced them. Mackey then asked his sister if she had spoken with Pineda, and she told him that she had. He asked whether she and Pineda had discussed the trial, and Hall told him they did not. Once the conversation was brought to the district court's attention by defense counsel, the court held an evidentiary hearing on the matter. The two women testified that they had not spoken of the trial and the district court concluded that no improper contact had taken place.

Reynolds argues that he is entitled to a new trial because of improper contact between Pineda and Hall. Improper, extrajudicial contact between the jury and a third party can indeed prejudice the defendant, *Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), but not in every case. *See Smith v. Phillips*, 455

U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (a jury in a criminal case must decide the case solely on the evidence before it). "The determination of whether the contact in a given case was prejudicial or harmless lies primarily within the discretion of the trial court." *United States v. Strickland*, 935 F.2d 822, 825 (7th Cir.), *cert. denied sub nom., Moore v. United States*, 502 U.S. 917, 112 S.Ct. 324, 116 L.Ed.2d 265 (1991); *United States v. Sababu*, 891 F.2d 1308, 1335 (7th Cir.1989). This court will reverse only if we have a very strong conviction of error. *United States v. Sanders*, 962 F.2d 660, 669 (7th Cir.), *cert. denied sub nom., Wilson v. United States*, —— U.S. ——, 113 S.Ct. 262, 121 L.Ed.2d 192 (1992) (citations omitted).

■ When an allegation of misconduct is made, a hearing should be held to determine the circumstances surrounding the improper contact and its impact on the juror. *Remmer*, 347 U.S. at 229–30, 74 S.Ct. at 451 (any contact with a juror is presumed prejudicial unless there is no reasonable possibility that the verdict was affected); *see Strickland*, 935 F.2d at 825. This is exactly what the trial judge did: an evidentiary hearing was held and both Hall and Pineda testified. After lengthy questioning, the court determined that the contact had not affected the verdict.[2] *See also United States v. Castello*, 830 F.2d 99, 101 (7th Cir.1987) ("Harmless contact between juror and a security officer is not grounds for reversal."). The contact between the women was brief and the trial was not discussed. After reviewing the transcripts of the hearing, we are not left with any conviction of error. *See Sanders*, 962 F.2d at 669.[3]

### B. Motion to Transfer

■ Prior to trial, Reynolds moved to transfer the trial from Evansville, Indiana, to Terre Haute, Indiana. The district court denied the motion. We review the district court's denial of a motion to transfer for an abuse of discretion. *United States v. Sidener*, 876 F.2d 1334, 1335 (7th Cir.1989).

■ Federal law provides that venue is proper in any district where an offense was begun, continued, or completed. 18 U.S.C. § 3237(a); *United States v. Sax*, 39 F.3d 1380, 1390 (7th Cir.1994) (citing *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 715 (1986)); *United States v. Simpson*, 995 F.2d 109, 112 (7th Cir.1993); *see* Fed.R.Crim.P. 18 (the trial judge has the discretion to fix the place of trial within the district with due regard for the convenience of the defendant and witnesses and the prompt administration of justice). Reynolds' illegal activities took place in the Southern District of Indiana, and he has "no constitutional right to a trial within a certain division" of that district. *Humphrey v. United States*, 896 F.2d 1066, 1068 (7th Cir.) (citing *United States v. Young*, 618 F.2d 1281, 1288 (8th Cir.1980)), *cert. denied*, 498 U.S. 938, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990).

■ Reynolds emphasizes that the site of the crimes with which he was charged and the evidence pertaining to them were in Terre Haute. However witnesses and evidence were in Evansville and Terre Haute, both of which are within the Southern District of Indiana. We thus cannot say the district court abused its discretion in denying the transfer. *See In re Chesson*, 897 F.2d 156, 159 (5th Cir.1990) (court must balance

---

**2.** We are troubled by one aspect of the evidentiary hearing. Juror Pineda was never asked explicitly if her knowledge that AUSA Mackey was Hall's brother prejudiced her in carrying out her duties as a juror. Her answers at the hearing at least strongly implied that she was not prejudiced by her knowledge. This simple question could have settled many of the issues raised here, but we conclude that the district court did not abuse its discretion in concluding that the contact did not affect the verdicts.

**3.** Reynolds also argues that Pineda's "lack of candor" during *voir dire* violated his right to a

fair trial. This issue was not raised to the district court, and is only reviewed for plain error. *United States v. South*, 28 F.3d 619, 625 (7th Cir. 1994). Prospective jurors were asked if they knew either AUSA or the two agents working on the case. No juror responded. There is no evidence here to suggest that Pineda was purposefully concealing her knowledge that AUSA Mackey was Hall's brother. She testified that she did not know Mackey personally at all, and therefore her silence when asked by AUSA Jackson if she knew them was not suspect.

statutory factors of the convenience of the defendant and witnesses with the prompt administration of justice).

To the extent that Reynolds argues that pre-trial publicity mandated a change in venue, his argument must fail. Reynolds submitted two newspaper articles discussing his trial: one from Terre Haute, and the other from Evansville. He has not shown how pre-trial publicity would have been avoided had the trial taken place in Terre Haute. Further, the district court carefully questioned prospective jurors regarding articles in the newspapers and considered the articles' effect on the fairness of the trial. Therefore the district court did not abuse its discretion in denying Reynolds' motion for transfer.

### C. Sufficiency of the Evidence

When faced with a challenge to the sufficiency of the evidence, a court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rodriguez*, 53 F.3d 1439, 1444 (7th Cir.1995) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We will not reweigh the evidence or judge the credibility of the witnesses. *United States v. Santos*, 20 F.3d 280, 283 (7th Cir.1994); *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993). Reynolds faces a heavy burden in this challenge. *Campbell*, 985 F.2d at 344.

Reynolds attacks the sufficiency of the evidence to support his conviction under 18 U.S.C. § 1956(a)(1)(B)(i) for money laundering. That section prohibits:

conduct[ing] a financial transaction knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity and knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of those proceeds.

*United States v. Koller*, 956 F.2d 1408, 1411 (7th Cir.1992). The government must prove

that: (1) Reynolds took part in a financial transaction involving the proceeds of specified unlawful activity; (2) he knew that the property involved was proceeds of specified unlawful activity; and (3) he knew that the transaction was designed, in whole or in part, to conceal or disguise the proceeds. *United States v. Antzoulatos*, 962 F.2d 720, 724 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 331, 121 L.Ed.2d 250 (1992).

Reynolds claims that Stoner's bank account already existed and thus there was no effort to disguise the nature or ownership of the funds. However, § 1956 does not require that an account such as this be established solely in preparation to receive stolen funds. The requirement of concealment or disguise can be directed to the nature, location, source, ownership or control of the proceeds. *United States v. Jackson*, 983 F.2d 757, 765 (7th Cir.1993). A financial transaction includes making a deposit into an account; that Reynolds knew of the stolen funds and utilized Stoner to avoid detection satisfies the statute.

Reynolds also brings to our attention that Congress has not defined "conceal" as it relates to the statutory definition of money laundering. He argues that this oversight makes it clear that he is not guilty. Reynolds directs us to two cases from other circuits where concealment was not shown. *United States v. Sanders*, 929 F.2d 1466 (10th Cir.) (car purchased in daughter's name), *cert. denied*, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991); *United States v. Gonzalez-Rodriguez*, 966 F.2d 918, 925–26 (5th Cir.1992) (defendant admitted possession of $8,000). These cases are inapposite because Reynolds' scheme clearly involved concealment. The evidence established that he knew that the funds were proceeds of the theft of union dues, that he directed their deposit into Stoner's account, and that he used the account to conceal or disguise the proceeds. *See United States v. Jackson*, 935 F.2d 832 (7th Cir.1991) (holding that a minister/drug dealer who directed his secretary to write checks for cash from church fund which included drug proceeds had tried to cover up his interest in the proceeds). A rational trier of fact could find that the essential elements

of this crime were proven beyond a reasonable doubt.

## D. Jury Instruction on Reasonable Doubt

■ Reynolds appeals the district court's refusal to define reasonable doubt for the jury. "There is no abuse of discretion in refusing to give such an instruction." *United States v. Tilmon*, 19 F.3d 1221, 1231 (7th Cir.1994); *see Victor v. Nebraska*, —— U.S. ——, ——, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) ("Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course"). "An attempt to define reasonable doubt presents a risk without any real benefit." *United States v. Hanson*, 994 F.2d 403, 408 (7th Cir.1993); *see also United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir.) (listing Seventh Circuit cases admonishing that the district court should not try to define reasonable doubt), *cert. denied*, —— U.S. ——, 114 S.Ct. 393, 126 L.Ed.2d 341 (1993). The pattern jury instructions of this Circuit state that "[t]he phrase 'reasonable doubt' is self-explanatory and is its own best definition. Further elaboration 'tends to misleading refinements' which weaken and make imprecise the existing phrase." 1 *Federal Criminal Jury Instructions of the Seventh Circuit* § 2.07 (1980) (citation omitted). Even in cases where the jury has requested a definition we have upheld the district court's decision not to define reasonable doubt. *See Blackburn*, 992 F.2d at 668; *United States v. Langer*, 962 F.2d 592, 599 (7th Cir.1992); *United States v. Shaffner*, 524 F.2d 1021, 1023 (7th Cir.1975) ("use of an instruction defining reasonable doubt presents a situation equivalent to playing with fire"), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). The Supreme Court has agreed that "reasonable doubt" is difficult to define. *Victor*, —— U.S. at ——, 114 S.Ct. at 1242. Thus the district court did not abuse its discretion in refusing to define reasonable doubt.

## E. Sentencing Departure

■ Reynolds also objects to the district court's failure to depart downward from his sentence dictated by the Sentencing Guidelines. He argues that his sentence should be equivalent to Stoner's, which, at 36 months, was substantially less than Reynolds' 115 months.[4] But we do not have jurisdiction to review a district court's exercise of its discretion to deny a departure from the Guidelines. *United States v. Wright*, 37 F.3d 358, 361 (7th Cir.1994); *United States v. Gaines*, 7 F.3d 101, 105 (7th Cir.1993) (decision to depart "wholly within the discretion of the district court [and] there is no appellate remedy available if a district court chooses not to depart"). Unless the district court erroneously believed that it did not have the legal authority to depart from the Guidelines, this court is without jurisdiction to review its refusal to depart. *United States v. Poff*, 926 F.2d 588, 590–91 (7th Cir.) (en banc), *cert. denied*, 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991). Because there is no indication in the transcript that the district court believed it lacked authority to depart, there is no jurisdiction to review the district court's decision. *United States v. Rosalez–Cortez*, 19 F.3d 1210, 1221 (7th Cir.1994) (if no indication that district court believed it lacked authority, court of appeals presumes it declined as a matter of discretion); *see* 18 U.S.C. § 3553(b).

## F. Restitution Order

■ Reynolds next claims that the amount of restitution the district court ordered him to pay is too great. Our review is for an abuse of discretion. *United States v. Dorsey*, 27 F.3d 285, 291 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 949, 130 L.Ed.2d 892 (1995). "[A] person actually unable to pay [restitution] may be directed to make restitution, provided there is some likelihood that he will acquire resources in the future." *United States v. Ahmad*, 2 F.3d 245, 247 (7th Cir.1993); *see also United*

---

**4.** Although the district court examined the disparity in sentencing and concluded that it was not the result of government manipulation or unfair proceedings but rather was fact-driven, we have not recognized that disparate sentences provide a valid ground for departure or a basis for challenging an otherwise legal sentence. *United States v. Dillard*, 43 F.3d 299, 311 (7th Cir.1994); *United States v. Stowe*, 989 F.2d 261, 264 (7th Cir.1993).

States v. Boula, 997 F.2d 263, 268 (7th Cir. 1993). The transcript reflects that the district court considered Reynolds' financial resources, needs, and earning ability. See United States v. Gio, 7 F.3d 1279, 1292 (7th Cir.1993). While Reynolds may not have been able to make restitution at the time of trial or sentencing, he had earned more than adequate money in the past and we cannot say that the district court abused its discretion in concluding that Reynolds would be able to earn money in the future and ordering him to pay restitution. United States v. Simpson, 8 F.3d 546, 551 (7th Cir.1993) (there must be some likelihood that the defendant will acquire resources in the future).[5]

■ Reynolds also argues that because he did not benefit from the full $345,000. he cannot be ordered to repay that amount. Section 18 U.S.C. § 3664(a) directs a sentencing court to consider a defendant's financial status as well as the amount of loss sustained by a victim. The district court did not order Reynolds to pay the full amount of loss to the victims, but rather the amount representing the sum of the cash he received from Stoner, the funds diverted to District 11's operating account and the third party checks converted by Reynolds. Imposing this amount of restitution is not an abuse of discretion.

■ Reynolds has only challenged the order of restitution as to its amount, not the procedures of payment.[6] Nonetheless, we conclude that the restitution order must be remanded. The district court ordered that restitution be overseen by the Probation Office. We have consistently held that when a sentencing court "inappropriately delegates to the probation department its authority to establish a payment schedule" for restitution, the order must be vacated. United States v. Mohammad, 53 F.3d 1426 (7th Cir.1995); United States v. Murphy, 28 F.3d 38, 42 (7th Cir.1994); see Boula, 997 F.2d at 269 (sentencing court must retain supervision over the payment of restitution and resolve any problems brought to the court's attention); United States v. Sung, 51 F.3d 92, 94 (7th Cir.1995) (when a court permits restitution by installment, the judge must specify the schedule). Therefore we vacate the order of restitution and remand to the district court with instructions to enter an order consistent with this opinion.

## III. CONCLUSION

For the reasons above, we affirm the district court's denial of Reynolds' motion for a new trial and motion for transfer. We also affirm Reynolds' conviction for money laundering and the district court's refusal to define reasonable doubt. We lack jurisdiction to review Reynolds' sentence. Finally, we vacate and remand the restitution order with instructions.

---

**5.** Reynolds argues that because the district court did not require him to pay a fine, he cannot be ordered to pay restitution. While the court did not impose a fine, it was within its discretion to order restitution. See Dorsey, 27 F.3d at 291–92 ("[f]ines and restitution are different animals"); cf. Ahmad, 2 F.3d at 247 (district court made finding that defendant could not pay fine now or in the foreseeable future).

**6.** The government has similarly remained silent on this issue.