**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

GREGORY PETER TORLAI, JR.,
*Defendant-Appellant*.

No. 11-10359

D.C. No.
2:08-cr-00329-
JAM-1

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
January 18, 2013—San Francisco, California

Filed August 26, 2013

Before: J. Clifford Wallace, Jerome Farris,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Criminal Law

The panel affirmed the sentence imposed following a jury conviction of sixteen counts of making a false claim for farm benefits in connection with the Federal Crop Insurance Act.

The panel held that by virtue of the defendant's fraud, he was not eligible for any government benefit under the crop insurance program, and therefore he was not an "intended beneficiary" under U.S.S.G. § 2B1.1 cmt. n.3(F)(ii). The panel thus rejected the defendant's argument that the district court erred, in its loss calculation, by failing to separate legitimate from illegitimate claims.

The panel held that the district court did not err by including in the loss amount the producer premiums the defendant paid – *i.e.*, the non-subsidized portion of the crop insurance premium for which an insured farmer is responsible.

The panel concluded that there was sufficient evidence that administrative and operating expenses paid by the government to the insurance company for selling and servicing the policy, and premium subsidies paid by the government to underwrite the crop insurance, were reasonably foreseeable to the defendant, and that the district court did not err by including them in its loss calculation.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

T. Louis Palazzo (argued), Palazzo Law Firm, Las Vegas, Nevada; Allen Lichtenstein, Las Vegas, Nevada, for Defendant-Appellant.

Michael D. Anderson (argued) and Kyle Reardon, Assistant United States Attorneys, United States Attorney's Office for the Eastern District of California, Sacramento, California, for Plaintiff-Appellee.

**OPINION**

BYBEE, Circuit Judge:

Thomas Jefferson once wrote to John Jay: "Cultivators of the earth are the most valuable citizens. They are the most vigorous, the most independent, the most virtuous, and they are tied to their country and wedded to its liberty and interests by the most lasting bands." 8 The Papers of Thomas Jefferson 426 (Julian P. Boyd et al. eds., Princeton University Press) (1950) (spelling modernized). Although an industrious cultivator of the earth, Gregory Peter Torlai did not prove the most virtuous. Torlai was convicted of sixteen counts of making a false claim for farm benefits in connection with the Federal Crop Insurance Act. At sentencing, the district court determined that Torlai had caused a loss of $410,372, resulting in a 14-level sentencing guideline increase. In this appeal, we consider whether the district court erred in its loss calculation. These are matters of first impression. We affirm.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.  *Federal Crop Insurance Program*

"Farming has literally been a feast or famine proposition since the beginning of time."  David F. Rendahl, *Federal Crop Insurance: Friend or Foe?*, 4 San Joaquin Agric. L. Rev. 185, 185 (1994).  "Most agricultural production is subject to the vagaries of weather, and the nature of agricultural supply and demand often results in volatile market prices."  Dennis A. Shields, Cong. Research Serv., R40532, Federal Crop Insurance: Background 1 (2012).  One of the most vivid illustrations of agricultural risk is the American Dust Bowl.  In the 1930s, the myopic agricultural practices of homesteaders coupled with severe drought resulted in widespread crop failure that left wide swaths of the Great Plains region of the United States highly susceptible to wind erosion.  *See* Richard Hornbeck, *The Enduring Impact of the American Dust Bowl: Short- and Long-Run Adjustments to Environmental Catastrophe*, 102 Am. Econ. Rev. 1477, 1479 (2012).  "Dust storms in the 1930s blew enormous quantities of topsoil off Plains farmland; on 'Black Sunday' in 1935, one such storm blanketed East Coast cities in a haze."  *Id.*  The destruction left in the Dust Bowl's wake was so severe that it triggered a massive exodus of farmers and their families who lost their livelihoods long before the dust settled.

The Dust Bowl's awful destruction not only motivated *The Grapes of Wrath*, but also spurred Congress to "authorize[] federal crop insurance as an experiment to address the effects of the Great Depression and crop losses seen in the Dust Bowl."  Shields, *supra* at 1.  It was only with the Federal Crop Insurance Act of 1980 ("FCIA"), 7 U.S.C.

§ 1501 *et seq.*, however, that Congress permanently authorized the federal crop insurance program. *Id.* The FCIA's express purpose is "to promote the national welfare by improving the economic stability of agriculture through a sound system of crop insurance." *Id.* § 1502(a).

"The federal crop insurance program provides producers with risk management tools to address crop yield and/or revenue losses on their farms." Shields, *supra* at 2. The program is administered by the federal government, but the insurance policies are sold through arrangements with private insurance companies. *Id.* "Independent insurance agents are paid sales commissions by the companies. The insurance companies' losses are reinsured by [the] USDA, and their administrative and operating [("A&O")] costs are reimbursed by the federal government." *Id.*

"In purchasing a policy, a producer growing an insurable crop [in a covered county] selects a level of coverage and pays a portion of the premium, which increases as the level of coverage rises. The remainder of the premium is covered by the federal government (about 62% of total premium, on average, is paid by the government)." *Id.* at 3. Thus, the federal crop insurance program subsidizes the cost borne by a farmer in obtaining crop insurance, increasing farmer participation. *See id.*

Generally speaking, there are two types of crop insurance policies: yield-based and revenue-based. *Id.* at 5. Yield-based crop insurance policies provide insured farmers with "an indemnity if there is a yield loss relative to the farmer's 'normal' (historical) yield." *Id.* In contrast, revenue-based crop insurance policies are more comprehensive, "protect[ing] against crop revenue loss resulting from

declines in yield, price, or both." *Id.* Like other insurance products, the differing crop insurance policies only provide an indemnity against certain risks of loss, usually related to unpredictable, weather-related events that are beyond the power of a farmer to control.

A farmer desiring to obtain crop insurance approaches a private insurer and is required to fill out an application for crop insurance containing detailed information: *e.g.*, the type of insurable crop; date of planting; applicable irrigation practice, if any; and acreage under cultivation. The farmer also provides an actual production history ("APH") for the parcel to be insured. The APH establishes a record of productivity for the subject parcel, assisting in the calculation of the policy premium and any benefits that might be required to be paid. This information must be received prior to planting the crop a farmer desires to insure. After planting, however, the farmer must submit an acreage report certifying the veracity of all final information submitted regarding the insured crop, including the amount of the farmer's insurable interest in the crop. This cumulative information is used to calculate the premium that applies to the issued crop insurance policy.

If, during the course of the growing season, a farmer's insured crop suffers a covered cause of loss, the farmer must comply with a claims procedure, including filing a notice of loss, to obtain an indemnity payment. As part of the claims process, an adjuster must inspect the crop to verify the farmer's asserted cause of loss and file a corresponding report—certified by the farmer—detailing information about the crop and the cause of loss. If the loss is determined to be covered by the crop insurance policy, the required indemnity will be paid to the farmer.

Although the crop insurance premium is due when the insurance policy is issued, in practice, the farmer is allowed to delay payment until either the insured crop is harvested and marketed, or a valid claim is submitted and an indemnity paid. Normally, when a valid claim is submitted, the farmer never pays the premium out-of-pocket; rather, the farmer receives an indemnity payment that is net the crop insurance premium the farmer remains owing.

## B. *Facts*

Torlai is an experienced farmer. In fact, for approximately thirty years, Torlai has been actively involved in the cultivation of numerous different crops on varied parcels of land throughout northern California, including in Contra Costa, Lassen, and San Joaquin counties. As part of his substantial farming operations, Torlai has long taken advantage of federal crop insurance programs to hedge against the risks he faces in his farming operations.

In 2008, an indictment was returned against Torlai charging him with seventeen counts of making a false claim for farm benefits. *See* 18 U.S.C. § 1014. The charges stemmed from misrepresentations that Torlai made in order to obtain crop insurance policies and collect indemnity payments on those policies for Stoney Creek Ranch (Lassen County) in 2001, 2002, and 2005; Union Island (San Joaquin County) in 2001; and Quimby Island (Contra Costa County) in 2001. Torlai's alleged misrepresentations included exaggerated acreage reports, misidentifying the crop planted, incorrect planting dates, claiming non-irrigated crops were irrigated, misrepresenting forage crops as crops for grain production, and inventing causes of loss.

## C. *Procedural History*

At trial, the jury convicted Torlai of all sixteen counts placed before them—the government having previously dismissed one of the seventeen counts in the indictment. The Pre-Sentence Report recommended that Torlai be given a 12-level sentencing guideline increase based on an estimated $350,000 loss. At the sentencing hearing, however, the government argued that the appropriate loss amount should be $410,372, requiring a 14-level sentencing guideline increase.[1] The government's proposed loss amount required the district court to determine that Torlai was not legitimately entitled to any portion of the indemnity payments he received, including (1) the gross amount of the indemnity without subtracting Torlai's portion of the crop insurance premium, and (2) the premium subsidies and A&O expenses paid by the government. The district court accepted the government's calculated loss amount, but varied from the sentencing guideline range and imposed a below-Guidelines sentence of concurrent terms of 30 months imprisonment and 36 months supervised release. Torlai timely appealed, arguing that the district court erred in imposing a 14-level sentencing guidelines increase for loss based on the government's calculation. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II. STANDARD OF REVIEW

Our appellate review of a sentence "is to determine whether the sentence is reasonable; only a procedurally

---

[1] United States Sentencing Guidelines §§ 2B1.1(b)(1)(G) and (H) provide that a loss greater than $200,000 results in a 12-level increase, and a loss greater than $400,000 results in a 14-level increase.

erroneous or substantively unreasonable sentence will be set aside." *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc); *see also Gall v. United States*, 552 U.S. 38, 46 (2007) ("Our explanation of 'reasonableness' review in the *Booker* opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions."). Thus, we must first consider "whether the district court committed significant procedural error" when determining Torlai's sentence. *Carty*, 520 F.3d at 993. "Procedural errors include, but are not limited to, incorrectly calculating the Guidelines range, treating the Guidelines as mandatory, failing properly to consider the § 3553(a) factors, using clearly erroneous facts when calculating the Guidelines range or determining the sentence, and failing to provide an adequate explanation for the sentence imposed." *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008). "If we discern no significant procedural error, we proceed to the second step and 'consider the substantive reasonableness of the sentence.'" *Id*. (quoting *Carty*, 520 F.3d at 993).[2]

We review "the district court's construction and interpretation of the Sentencing Guidelines de novo," *United States v. Nielsen*, 694 F.3d 1032, 1034 (9th Cir. 2012), and "the district court's application[] of the Guidelines to the facts" for abuse of discretion, *United States v. Holt*, 510 F.3d 1007, 1010 (9th Cir. 2007). We will only reverse a district court's decision as an abuse of discretion where we either "determine de novo [that] the trial court identified the [in]correct legal rule to apply," or "determine [that] the trial court's application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences

---

[2] Torlai does not contest the substantive reasonableness of his sentence.

that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc) (internal quotation marks omitted).

We review the district court's factual determinations, "including the calculation of the victim's loss, . . . for clear error." *United States v. Tulaner*, 512 F.3d 576, 578 (9th Cir. 2008). "The clear error standard is significantly deferential and is not met unless [we are] left with a definite and firm conviction that a mistake has been committed." *Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1136 (9th Cir. 2011) (internal quotation marks omitted). "[I]f the district court's findings are plausible in light of the record viewed in its entirety, [we] cannot reverse even if [we are] convinced [we] would have found differently." *United States v. McCarty*, 648 F.3d 820, 824 (9th Cir. 2011) (internal quotation marks omitted). Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003) (internal quotation marks omitted).

## III.  DISCUSSION

When imposing a sentence upon an individual convicted of making a false claim for farm benefits pursuant to 18 U.S.C. § 1014, a district court is guided by the United States Sentencing Guidelines ("USSGs") § 2B1.1. While the USSGs are only advisory, *see United States v. Booker*, 543 U.S. 220, 245 (2005), a district court must correctly calculate the guideline range before imposing a reasonable sentence, *see Gall*, 552 U.S. at 51. At issue in the instant appeal is the district court's loss calculation used to derive the sentencing guidelines range applicable to Torlai's conviction.

The "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993); *see also United States v. Jackson*, 697 F.3d 1141, 1146 (9th Cir. 2012) (per curiam). The commentary to § 2B1.1 indicates that a portion of the sentencing guideline range is dictated by the loss table, and the relevant instructions for properly using the loss table are contained in application note 3.

Specifically, "loss is the greater of actual loss or intended loss," subject to certain exceptions that are not relevant in this case. U.S.S.G. § 2B1.1 cmt. n.3(A). The application note continues by defining "actual loss" as "the reasonably foreseeable pecuniary harm[3] that resulted from the offense." *Id.* § 2B1.1 cmt. n.3(A)(I). "Intended loss" is defined as: (1) "[T]he pecuniary harm[4] that was intended to result from the offense," and (2) "includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 cmt. n.3(A)(ii).

A special rule, however, applies to cases involving government benefits:

---

[3] "Reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(iv).

[4] "Pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money." Pecuniary harm "does not include emotional distress, harm to reputation, or other non-economic harm." U.S.S.G. § 2B1.1 cmt. n.3(A)(iii).

> In a case involving government benefits (*e.g.*, grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by *unintended recipients* or diverted to *unintended uses*, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

*Id.* § 2B1.1 cmt. n.3(F)(ii) (emphasis added).[5] Nevertheless, the district court "need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." *Id.* § 2B1.1 cmt. n.3(C);

---

[5] Crop insurance obtained through the federal crop insurance program is a government benefit for purposes of § 2B1.1 cmt. n.3(F)(ii). The federal crop insurance program is a subsidy program intended to benefit farmers specifically, and society more generally, through a more stable agricultural system. Although federal crop insurance is not identical to the federal food stamp program included as an example in § 2B1.1 cmt. n.3(F)(ii), the federal crop insurance program is similar in that it provides a subsidy to a particular subset of the United States population. Thus, the benefit a farmer receives through participation in the federal crop insurance program—premium subsidy—is a government benefit similar to "entitlement program payments." *See* § 2B1.1 cmt. n.3(F)(ii); *cf. United States v. Maxwell*, 579 F.3d 1282, 1306–07 (11th Cir. 2009) (characterizing a contract received under a federally funded Disadvantaged Business Enterprises program—for the purpose of "help[ing] small minority-owned businesses develop and grow"—as a government benefit); *United States v. Tupone*, 442 F.3d 145, 153–54 (3d Cir. 2006) (characterizing federal workers' compensation benefit payments as a government benefit).

*see also United States v. W. Coast Aluminum Heat Treating Co.*, 265 F.3d 986, 991 (9th Cir. 2001) ("[T]he district court's obligation is to adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented.").**[6]**

Torlai's entire appeal is centered on an alleged error committed by the district court in determining the loss amount. In this regard, Torlai advances three main arguments: (1) The district court improperly based its loss calculation on the "premise that Torlai's statements were

---

**[6]** Torlai has argued that certain facts relied on by the district court in sentencing either were not determined by the jury, or the jury did not find certain facts beyond a reasonable doubt that the district court subsequently relied on at sentencing. As we have previously stated:

> This argument fundamentally misunderstands the current state of constitutional law on sentencing. The relevant Sixth Amendment question is not . . . whether [the district court] found facts that were not proven beyond a reasonable doubt by the jury in the process of calculating the guidelines range. Rather, the Sixth Amendment question . . . is whether the law *forbids* [the district court] to increase a defendant's sentence *unless* the [district court] finds facts that the jury did not find (and the offender did not concede). Because the sentencing guidelines are advisory after *Booker*, the Sixth Amendment does not require that the loss be proved to a jury beyond a reasonable doubt.

*United States v. Hickey*, 580 F.3d 922, 932 (9th Cir. 2009) (internal citations and quotation marks omitted); *see also Dillon v. United States*, 130 S. Ct. 2683, 2692 (2010) ("Taking the original sentence as given, any facts found by a judge at a § 3582(c)(2) proceeding do not serve to increase the prescribed range of punishment; instead, they affect only the judge's exercise of discretion within that range[,] . . . and the exercise of such discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts.").

false in their entirety." Torlai argues that this was error because he was legitimately entitled to some insurance, even if not everything he claimed. (2) The court erroneously included his entire indemnity claim as loss, even though any indemnity payment made by the government would have been reduced by the amount that he owed as an insurance premium. (3) The court impermissibly included amounts spent by the government on A&O expenses and premium subsidies as "reasonably foreseeable intended pecuniary losses."[7] We consider each of Torlai's arguments in turn.

## A. *Indemnity Payment as the Basis for Loss Calculation*

First, Torlai argues that he actually planted and lost some legitimately insured crops. Torlai asserts that he "[c]learly . . . did, in fact, plant crops that were insured under the policies issued," but "[n]either the jury at trial nor the Court

---

[7] Torlai also argues that the Rule of Lenity should apply because the district court "readily admitted that there was no case law to guide [the court] in [its] sentencing decisions" and, therefore, the district court "invoked its interpretation of the Federal Sentencing Guidelines." We have previously held that the Rule of Lenity applies to our interpretation of the USSGs, as well as penal statutes. *United States v. Fuentes-Barahona*, 111 F.3d 651, 653 (9th Cir. 1997) (per curiam). Further, we have held that "[t]he rule of lenity is applicable only where there is a grievous ambiguity or uncertainty in the language and structure of [an] Act, such that even after a court has seize[d] every thing from which aid can be derived, it is still left with an ambiguous statute." *United States v. Bendtzen*, 542 F.3d 722, 727–28 (9th Cir. 2008) (internal quotation marks omitted and alterations in original). Our analysis shows that the relevant sentencing guideline is not "grievous[ly] ambigu[ous]." The mere fact that there is a dearth of pre-existing caselaw does not ineluctably force us to conclude that the district court could make no more than a guess as to what the relevant sentencing guideline meant. Torlai's Rule of Lenity argument is without merit.

at sentencing ever attempted to ascertain what portions of those indemnities paid were legitimate and what portions were not." In Torlai's estimation, the district court merely assumed "that Defendant was not entitled to any of the money he received in the form of indemnity payments," with "[n]o attempt [being] made to separate the legitimate from the illegitimate claims for the purpose of determining how much of the insurance claim was fraudulent . . . and how much of the claim was not erroneous." Thus, Torlai argues that the district court should have conducted an analysis "to determine how much of [his] claims or intended claims, [*sic*] were legitimate under the policies in effect," and that amount should be subtracted from loss calculation under the government benefits provision of § 2B1.1 cmt. n.3(F)(ii).

In a government benefits case, "loss shall be considered to be not less than the value of the benefits obtained by *unintended recipients* or diverted to *unintended uses*." U.S.S.G. § 2B1.1 cmt. n.3(F)(ii) (emphasis added). Only the illegitimate portion of the value of the government benefits should be included in the loss calculation. *Id.* Torlai argues that if he truly planted some eligible crop that was covered under a valid crop insurance policy but, for example, had overstated the acreage under cultivation, and the crop insurance policy was valid notwithstanding the false statement, then the district court would have been required to determine the amount of the resulting indemnity payment to which Torlai would have been legitimately entitled under the valid crop insurance policy. We need not address Torlai's argument because it assumes a premise he cannot sustain: that Torlai retained a valid crop insurance policy despite his misrepresentations. Importantly, however, each of the applications for crop insurance submitted by Torlai contained "Conditions of Acceptance," providing that Torlai's

"Application [wa]s accepted and insurance attache[d] in accordance with the policy *unless . . . any material fact [wa]s omitted, concealed or misrepresented in th[e] Application or in the submission of th[e] Application*." (emphasis added). This is consistent with the basic policy provisions that were in effect when Torlai received crop insurance on the parcels charged in the indictment. In each relevant year, the basic Crop Revenue Coverage Insurance Policy provided: "[I]f you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy . . . *[the] policy will be voided* ."**[8]** *See, e.g.*, Risk Mgmt. Agency,

---

**[8]** The complete policy provision states:

### 27.  Concealment, Misrepresentation or Fraud

   (a)  If you have falsely or fraudulently concealed the fact that you are ineligible to receive benefits under the Act or if you or anyone assisting you has intentionally concealed or misrepresented any material fact relating to this policy:

      (1)  This policy will be voided; and

      (2)  You may be subject to remedial sanctions in accordance with 7 CFR part 400, subpart R.

   (b)  Even though the policy is void, you may still be required to pay 20 percent of the premium due under the policy to offset costs incurred by us in the service of this policy. If previously paid, the balance of the premium will be returned.

   (c)  Voidance of this policy will result in you having to reimburse all indemnities paid for

USDA, 2001 Crop Revenue Coverage (CRC) Insurance Policy, 01-CRC-BASIC 14 (2000) (emphasis added). Thus, if Torlai misrepresented any material fact in his policy application, then his crop insurance policies would be void and the district court could determine that Torlai was not an intended recipient of the government benefit at issue—crop insurance indemnity payments.

Our review of the record reveals sufficient evidence that Torlai was not entitled to any portion of the indemnity payments.

1.  Stoney Creek Ranch 2001

The Pre-Sentence Report found that Torlai actually planted substantially less than the 499 acres of wheat for Stoney Creek Ranch in 2001 he reported, and that the wheat that was planted was not irrigated. Torlai also misstated his interest in the crops grown on Stoney Creek Ranch. Moreover, Torlai only purchased enough beardless wheat seed to plant approximately 120 acres of non-irrigated

---

the crop year in which the voidance was effective.

(d)  Voidance will be effective on the first day of the insurance period for the crop year in which the act occurred and will not affect the policy for subsequent crop years unless a violation of this section also occurred in such crop years.

Risk Mgmt. Agency, USDA, 2001 Crop Revenue Coverage (CRC) Insurance Policy, 01-CRC-BASIC 14 (2000); Risk Mgmt. Agency, USDA, 2002 Crop Revenue Coverage (CRC) Insurance Policy, 02-CRC-BASIC 15–16 (2001); Risk Mgmt. Agency, USDA, 2005 Crop Revenue Coverage (CRC) Insurance Policy, 05-CRC-BASIC 24 (2004).

land—though he had altered an invoice to make it appear as if he had purchased a greater quantity of seed. Thus, the record reveals that Torlai made multiple material misstatements that rendered his crop insurance policy for Stoney Creek Ranch in 2001 void. This evidence was clearly sufficient for the district court to determine that Torlai was not an intended beneficiary of any indemnity payment related to Stoney Creek Ranch in 2001.

Furthermore, regardless of the validity of Torlai's crop insurance policy for Stoney Creek Ranch in 2001, the government will not pay an indemnity unless the farmer has filed a valid claim. That is, a farmer covered by a crop insurance policy must show that the loss he suffered was caused by a covered event. Regarding the 2001 Stoney Creek Ranch crop, Torlai based his claim for an indemnity payment on losses supposedly resulting from hail, wind, and excessive precipitation. The evidence showed, however, that there was "no crop to be impacted by the causes of loss." The satellite images introduced into evidence did not show any evidence of a wheat crop that had developed to a sufficient stage of maturation that could have been harmed by the purported causes of loss. Even assuming that the weather events Torlai reported did occur and that Torlai grew some portion of the insured crop and had a valid crop insurance policy, the evidence clearly showed that the weather events asserted in the filed claim could not have caused any damage and, therefore, Torlai was entitled to no indemnity. The absence of a legitimate cause of loss means that Torlai was not an intended beneficiary of any indemnity for Stoney Creek Ranch in 2001, regardless of any other factors.

2.  Stoney Creek Ranch 2002

The Pre-Sentence Report found that Torlai actually planted substantially less than the reported 836.1 acres of wheat for Stoney Creek Ranch in 2002, and that the wheat that was planted was not irrigated.  The Pre-Sentence Report's conclusion is supported by the record.  Likewise, Torlai again misstated his interest in the crops grown on Stoney Creek Ranch.  In fact, satellite images revealed that there was insufficient land cleared on Stoney Creek Ranch to even plant 499 acres of wheat.  "[A]pproximately 536 of the 836.1 acres reported as planted to wheat by [Torlai] ha[d] not been converted from native vegetation grass" during the relevant time period.  Furthermore, crop insurance adjusters did not find any wheat planted in fields that Torlai represented as having been planted to wheat.  What crop insurance adjusters did find were large pits full of garbage and debris, a far-cry from a wheat stand.  Thus, the record reveals that Torlai made material misstatements that render his crop insurance policy for Stoney Creek Ranch in 2002 void.  On that basis, the evidence was sufficient for the district court to determine that Torlai was not an intended beneficiary of any indemnity payment related to Stoney Creek Ranch in 2002.

Regardless of the validity of Torlai's crop insurance policy for Stoney Creek Ranch in 2002, Torlai did not have a valid claim for loss.  During an unscheduled visit by crop insurance adjusters, they discovered that the wheat had been grazed off by cattle.  In response, Torlai withdrew his claim.  Even assuming that Torlai had a valid crop insurance policy and that the asserted cause of loss was legitimate, the fact that horses or cattle had grazed off the purportedly insured crop voided the insurance contract and nullified Torlai's claim,

entitling him to no indemnity payment. As a consequence, Torlai was not an intended beneficiary of any indemnity for Stoney Creek Ranch in 2002.

   3.   Stoney Creek Ranch 2005

   As with the previous claims, the Pre-Sentence Report concluded that Torlai had actually planted substantially less than the reported 650 acres of wheat for Stoney Creek Ranch in 2005, and that the wheat that was planted was not irrigated. The Pre-Sentence Report's conclusion is supported by the record. Torlai also misstated his interest in the crops grown on Stoney Creek Ranch. Thus, the record reveals that Torlai made material misstatements that render his crop insurance policy for Stoney Creek Ranch in 2005 void.

   Furthermore, the evidence showed that Torlai had no intention of harvesting any of the wheat that was planted because the wheat was of a variety used as a forage crop for beeves and thus was not eligible for crop insurance. Even if the fields represented by Torlai as having been planted had actually been planted to a variety of wheat intended for being harvested as grain, Stoney Creek Ranch's rocky, sagebrush-covered terrain was such that a combine would have been unable to harvest a wheat crop. The absence of an insurable crop means that Torlai was not an intended beneficiary of any indemnity for Stoney Creek Ranch in 2005.

   We note that the Stoney Creek Ranch claims submitted by Torlai in 2002 and 2005 were not actually paid. The evidence is sufficient, however, to support a finding by the district court that Torlai intended in both 2002 and 2005 to follow the pattern of his successful Stoney Creek Ranch crop insurance fraud perpetrated in 2001. Thus, the amounts that *would have*

*been paid* as an indemnity for both the 2002 and 2005 claims were properly considered by the district court as intended losses. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(ii); *United States v. McCormac*, 309 F.3d 623, 627–29 (9th Cir. 2002).

### 4.  Union Island 2001

Torlai claimed that safflower was planted on Union Island in 2001 and that the crop failed due to inclement weather. Contemporaneous records show, however, that the fields that were supposedly planted in safflower were actually planted in corn and alfalfa. This evidence was supported by satellite images. The satellite images did, however, show that approximately 34.7 acres were planted in safflower, though the record is ambiguous as to whether the 34.7 acres of safflower documented by satellite images was on Torlai's property. Regardless, Torlai had reported that he had planted 199.3 acres in safflower on Union Island in 2001. Torlai's material misstatements render his crop insurance policy for Union Island in 2001 void.

Furthermore, the evidence showed that the alleged date of loss—April 10, 2001—was only five days after the date the safflower was reportedly planted—April 5, 2001. The testimony at trial established that "safflower emergence usually takes between one and three weeks." So, the evidence showed that any safflower that might have actually been planted on Union Island would not have emerged from the soil before the date of the alleged cause of loss. Even if Torlai had a valid crop insurance policy, there was sufficient evidence for the district court to find that Torlai could not have suffered a cognizable cause of loss within five days of sowing.

5.  Quimby Island 2001

Quimby Island was mostly inundated with water at the alleged time of planting, and wheat cannot be planted when the soil is submerged.  Moreover, evidence was presented that at the alleged time of loss, the crop had not grown to a point where it could have been adversely impacted by the hail, excess precipitation, inclement weather, and wind that were the causes of loss Torlai alleged.  Even assuming that the weather events did occur, the evidence clearly showed that the weather could not have caused any damage, and Torlai was not entitled to indemnity.  The absence of a legitimate cause of loss means that Torlai was not an intended beneficiary of any indemnity for Quimby Island in 2001.

*     *     *     *     *

By virtue of his fraud, Torlai was not eligible for any government benefit under the crop insurance program, and therefore, he was not an "intended beneficiary."  The district court did not err in including the full indemnity amount for all claims from Stoney Creek Ranch in 2001, 2002, 2005; Union Island in 2001; and Quimby Island in 2001.

B.  *Accounting for Premiums Withheld by the Insurer*

Torlai argues that the district court erred by "not taking into account the producer premiums [he] paid," *i.e.*, the non-subsidized portion of the crop insurance premium for which an insured farmer is responsible.  As we have discussed, although producer "premiums are owed at the start of the growing season," they do not have to be paid until after harvesting the insured crop. So, when an event occurs that is covered by crop insurance and a farmer has not yet satisfied

the premium, the amount of the producer premium is deducted from the actual amount paid to the insured. Torlai argues that since "the indemnity payment actually received would be the indemnity under the policy minus the producer premium, that premium is not an offset," and some $28,874 of producer premiums should not be included as a loss to the government. Torlai asserts that he "would [n]ever be able to obtain [these funds] for himself through fraud or otherwise." Essentially, Torlai contends that because he never expected to get the full amount of the indemnity—*i.e.*, he only ever intended to obtain the indemnity less the producer premium—the producer premiums should not be calculated as part of the total loss.

The district court addressed this issue, stating:

> To offset the losses in this case by any money paid by [Torlai] to purchase his crop insurance would be akin to giving an arsonist credit for the cost of insurance premiums paid by him on a house that he burned down.

> That [Torlai's] fraud occurred in the context of crop insurance, where premiums are owed at the start of the growing season, but payable after harvest, as opposed to more traditional forms of insurance, where premiums are due upon the commencement of coverage, does nothing to change the analysis. Fraud is fraud, and [Torlai] is not entitled to credit for monies he invested in order to insure the success of his fraudulent scheme.

We have not previously considered this issue, but we agree with the district court.

Although the sentencing guidelines provide some guidance as to what factors should offset a loss calculation, U.S.S.G. § 2B1.1 cmt. n.3(E)[9], in the end we think the "Credits Against Loss" commentary is inapplicable. Rather, as Torlai argues, the issue is not whether the producer premiums are offsets, but whether the withheld producer premiums should be included in the intended loss amount. Viewed in this light, the district court properly applied the Guidelines.

---

[9] Application note 3 states, in part:

Loss shall be reduced by the following:

(I)   The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

(ii)   In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1 cmt. n.3(E).

Torlai points to a case from the Seventh Circuit, *United States v. Simpson*, 995 F.2d 109 (7th Cir. 1993), that suggests a farmer's portion of crop insurance premiums should be deducted from the calculated loss amount. *Simpson* is an interesting case with a few more twists than presented here; however, the core fact pattern is similar: Simpson was convicted of filing false insurance forms under the USDA's crop insurance subsidy programs. *Id.* at 110. Regarding this issue, the Seventh Circuit stated:

> The district court erred when it figured the amount of loss, however, in that it failed to deduct a $74,000 premium from the $838,900 false claims. If Simpson had seen his scheme through to payment, [the insurance company] would have deducted the premium from the amount of Simpson's claims. As the government conceded at oral argument, the proper amount of loss was the amount of the claims minus the premium . . . . This clear error requires a remand so that the district judge may recalculate Simpson's sentence.

*Id.* at 113 (internal citation omitted). Thus, the Seventh Circuit has at least implicitly held that it is clear error for a district court to fail to deduct the producer premium from the total indemnity.

We do not lightly cast aside reasoned decisions of our sister circuits. *See In re Taffi*, 68 F.3d 306, 308 (9th Cir. 1995). We disagree, however, with the Seventh Circuit's brief analysis in *Simpson*. The lack of detailed analysis on this issue may be the product of the fact that the government conceded at oral argument before the Seventh Circuit that

"the proper amount of loss was the amount of the claims minus the premium." *Simpson*, 995 F.2d at 113. Thus, a critical concession by the government on this issue made further analysis of this issue unnecessary by the Seventh Circuit, rendering *Simpson* minimally persuasive and of questionable precedent.

Considering the merits of the issue itself, quite simply, the rule that *Simpson* stands for—loss calculations in crop insurance fraud cases must only include indemnities minus the producer premium—overlooks basic economic reality and common sense. A farmer must pay the crop insurance producer premium *regardless* of whether an indemnity will be paid. The producer premium is due when the crop insurance policy is issued, and the fact that a farmer can delay payment until harvest or a valid claim is submitted for payment does not negate the farmer's responsibility for that amount. In effect, the government has fronted the farmer his crop insurance premium, which he took and then used to defraud the government.[10] Even though Torlai did not have to withdraw money from his own bank account to pay the producer premium, he, in effect, benefitted by the full amount of the indemnity. From an economic perspective, Torlai was in the same financial condition as he would have been had he

---

[10] Where a farmer is found to have intentionally concealed or misrepresented a material fact in obtaining crop insurance, "[e]ven though the policy is void, [the farmer] may still be required to pay 20 percent of the premium due under the policy." Risk Mgmt. Agency, USDA, 2001 Crop Revenue Coverage (CRC) Insurance Policy, 01-CRC-BASIC 14 (2000).

paid the producer premium up front and was paid the full amount of the indemnity on the back end.[11]

---

[11] To illustrate this point, we lay out two simplified scenarios for pedagogical purposes: (1) Farmer 1 purchases crop insurance and is required to pay the full amount of the producer premium ($10) on the date the policy is issued; and (2) Farmer 2 purchases crop insurance, but can delay premium payment until the date the insured crop is harvested so that, if a valid claim is submitted, Farmer 2 will receive an indemnity payment net the producer premium ($10). If a valid cause of loss occurs, the indemnity payment is $30. For the sake of simplicity, we assume that both Farmer 1 and 2 begin with an identical balance in their respective bank accounts ($100).

In a situation where no covered cause of loss is suffered, Farmer 1's bank account will show the following balance: $100 - $10 = $90. Farmer 2's bank account will have an identical balance: $100 - $10 = $90. The only difference is the time when the $10 premium is withdrawn. Now consider a situation where a valid claim is submitted. Farmer 1's bank account will show the following balance: $100 - $10 = $90 + $30 = $120. Farmer 1 pays the $10 producer premium when purchasing insurance, decreasing his bank account to $90; after Farmer 1 submits a valid claim, he is entitled to the full indemnity amount, resulting in a terminal balance of $120. Farmer 2's bank account will show the following balance: $100 + ($30 - $10) = $120. So, Farmer 2 would never pay the producer premium out of his own bank account, but the end result is the same. Again, the only difference is that Farmer 2 is able to have the benefit of an extra $10 in his bank account over the course of the crop season. Essentially, the government has provided Farmer 2 with an interest-free loan in the amount of the crop insurance premium. Ultimately, however, both Farmers 1 and 2 expect to receive an identical benefit from the indemnity payment. Both would be in the same economic position.

In a more complicated economic world in which there is a time value to money, Farmer 2 would be better off, since Farmer 2 had the benefit of retaining the extra $10 in his bank account for a period of time—money that he could have invested or put to other uses—and concluded at the same time with an amount identical to Farmer 1. So, if anything, the simple calculation applied by the district court understates the true

Importantly, the only reason Torlai did not expect to pay the producer premium, and expected to receive the indemnity payments net the producer premium, was because Torlai obtained crop insurance through fraud. As the district court put it, "Fraud is fraud, and [Torlai] is not entitled to credit for monies he invested in order to insure the success of his fraudulent scheme." An honest farmer, purchasing crop insurance to hedge against agricultural risks would fully expect to pay the producer premium. As an experienced farmer with knowledge of the crop insurance system, Torlai understood that if he successfully perpetrated his fraudulent scheme, he would *never* have to pay the producer premium.[12] Regardless, the actual loss to the government was the full amount of the indemnity. In the context of crop insurance, whether the producer premium is paid when the policy is purchased or whether the government subtracts the producer premium from the indemnity paid, the government is in the same economic position. *See United States v. Blitz*, 151 F.3d 1002, 1010 (9th Cir. 1998) ("In other words, when we have required a realistic economic approach we have indicated that we should not ascribe a larger loss to the defendants than they intended to or actually did inflict. We have not, however, hesitated to hold defendants responsible for the full reach of their intent, even when that intent was thwarted.").

---

economic benefit that Torlai received by waiting to pay the producer premium.

[12] In this sense, the district court's statement that subtracting the amount of the producer premium from the loss calculation was like "giving an arsonist credit for the cost of insurance premiums paid by him on a house that he burned down" is quite apt.

We conclude that the district court did not err by including the total amount of the indemnities in the loss calculation.

C. *Accounting for Premium Subsidies and A&O Expenses in Loss Calculation*

In addition to calculating the total indemnities claimed, whether the government actually paid them or not, the district court also included in the loss calculation two other categories of expenses: A&O expenses and premium subsidies. The A&O expenses are fees the government pays to the insurance company for selling and servicing the policy. Premium subsidies are the amounts the government pays to the insurance company to underwrite the crop insurance, which the insurance company would not otherwise be willing to do. In other words, a premium subsidy is the government's share of the premium; it is a measure of the actual cost of having a crop insurance program above that paid by the farmer.

The district court included the totals for both categories of expenses in its loss calculation. It found that the A&O expenses and premium subsidies were "reasonably foreseeable pecuniary losses for which [Torlai] should be held accountable. Even though he didn't have a check cut to him, it was money that was, in effect, . . . taken away from other farmers. It was, in particular the premium subsidies, not available [to other farmers]." The district court also found that there was a non-speculative method to calculate the "premium subsidy and A&O based on documents." Torlai argues that it was error for the district court to include these expenses, and that "the inclusion of all premium subsidy and A&O expenses as part of the loss calculation is

based on an assumption that [he] was ineligible for any crop insurance policy at all." Torlai contends that no "evidence [was] ever presented that [he] either knew about premium subsidies or A&O expenses, or that circumstances existed under which he reasonably should have known about them."[13]

Contrary to Torlai's contention, there was evidence to support the district court's conclusion that the premium subsidies and A&O expenses were "reasonably foreseeable pecuniary losses for which [Torlai] should be held accountable." Regarding the premium subsidies, the evidence showed that the premium subsidies were specifically disclosed to Torlai through his summaries of crop insurance coverage. Moreover, the government presented evidence showing that each crop insurance policy, including Torlai's, indicates "at the top of them, . . . that the policy is reinsured by the federal government." And, a witness testified that "[t]he standard reinsurance agreements are available online at the public website," and the policies specifically state that the crop insurance program is administrated by the private insurer. The reinsurance agreements provide detailed information about the details of both the premium subsidies and A&O expenses. Considering all this evidence, coupled with Torlai's status as an experienced farmer who has extensively used crop insurance as a part of his operations, we conclude that this evidence is sufficient to show that Torlai, at least, reasonably should have

---

[13] Torlai also asserts that any increase in the loss calculation ascribable to A&O expenses and premium subsidies "is a factual matter that should properly have been determined by the jury" in light of *Booker*, 543 U.S. at 231. The jury was not required to determine the amount of the A&O expenses and premium subsidies. *See supra* note 6. At sentencing, all that is required is that the government prove the loss by a preponderance of the evidence. *Armstead*, 552 F.3d at 776.

known of the premium subsidies and A&O expenses under the circumstances. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(iv).[14]

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** Torlai's sentence.

---

[14] Although § 2B1.1 cmt. n.3(A) of the Guidelines states that "loss is the greater of actual loss or intended loss," Torlai has not claimed that it was error for the district court to calculate the total loss by adding together some elements representing intended losses and others, including A&O expenses, representing actual losses. Any argument to this effect has been waived, *see Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived."). We decline to reach the question whether it was proper to consider both intended and actual losses together. *See* U.S. Sentencing Guidelines Manual § 2B1.1 cmt. n.3(A) ("[L]oss is the greater of actual loss or intended loss . . . ."); *see also United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) (discussing that intended loss may include actual losses "the defendant *purposely* sought to inflict.").