SILVER, District Judge,
dissenting:
Having fully evaluated the many statutes, regulations, and policies at issue, as well as the record and opinion of the district court, I regrettably must dissent from the majority.
I find the district court did make credibility findings and determined Cisneros was not credible. Under the applicable standard of review, deference is required. Also, I believe the law governing administrative removal proceedings would have prevented Cisneros from staying, vacating, or converting the proceedings. Finally, although I agree that with assistance of counsel, Cisneros theoretically could have petitioned for and received a decision regarding a U-visa prior to her removal from the United States, I disagree that Cisneros has carried the burden to establish she plausibly would have been granted a U-visa. Accordingly, I dissent.
I. Due Process
On the issue of due process, the majority concludes the “critical question” is whether “Linares advised Cisneros that an attorney could not help her” and that the district court did not decide this question. However, reading the entirety of the district court opinion in context, I find the district court did decide this question and, based on the record before this court, that determination is entitled to strong deference. Alternatively, even if the district court did not decide this question, this court is required to remand for resolution of all underlying factual issues.
A. The District Court’s Factual Findings
All parties concede the district court made factual findings regarding Cisneros’s right to counsel. Cisneros’s opening brief on appeal argues the district court was incorrect in finding Cisneros was properly advised of her rights. The reply brief repeats this argument, stating the district court “credited Agent Linares’ testimony” and relied on “clearly erroneous factual findings” in concluding Agent Linares properly advised Cisneros of her rights. The government’s brief also claims the district court made factual findings regarding Cisneros’s right to counsel.
I agree the district court did not explicitly and expressly reject Cisneros’s testimony that Linares affirmatively dissuaded her from obtaining an attorney. But reading the opinion as a whole, the district court found Cisneros incredible regarding what Linares told her about counsel. Assuming the district court’s factual findings were only implicit rather than explicit, with both parties agreeing factual findings were made, this court is required to review those findings under the normal standard of review: clear error. See United States v. Kinsman, 540 F.2d 1017, 1019 (9th Cir.1976), withdrawn on other grounds, 573 F.2d 3 (9th Cir.1978) (district court’s implicit factual findings must be reviewed for clear error). Furthermore, a district court’s credibility findings are entitled to a high degree of deference. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (“When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court’s findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding of and belief in what is said.”). *764 This deference precludes an appellate court from substituting a preferred opinion of the evidence: “[I]f the district court’s findings are plausible in light of the record viewed in its entirety, [we] cannot reverse even if [we are] convinced [we] would have found differently.” United States v. Torlai, 728 F.3d 932, 937 (9th Cir.2013) (citation omitted).
The majority’s analysis of the district court’s credibility findings is contrary to the well-established required deference in two respects. First, it adopts a rule of construction without support in law that a district court must credit all or none of a witness’s testimony. Second, the district court found the portions of Cisneros’s testimony regarding the information she received about her right to counsel explicitly not credible.
The record shows at one point, Cisneros testified she told Linares she had been the victim of extortion. But the district court remarked there was “no credible evidence in the record that [Cisneros] told Linares ... that she had been a victim of extortion.” (emphasis added). The district court also rejected Cisneros’s testimony regarding her right to counsel and held:
As it relates to the issue of [Cisneros] having access to an attorney, the testimony is in conflict. Linares testified that at their meeting he would have provided [Cisneros] with a list of legal counsel. Defendant testified that Li-nares never gave her, or any of the other two person [sic] being processed at the same time a list of lawyers. As Linares testified that it is his habit to provide all aliens he processes with a list of attorneys, the Court finds it unlikely that none of the aliens being processed at this time were so provided ... [FN 3] While the Court makes this finding, it also acknowledges that evidence of disciplinary action taken against Linares by ICE was introduced as impeachment during cross-examination.
(emphasis added). Based on the findings cited above, it is clear the district court did not believe Cisneros was telling the truth about the actions and statements she alleged Linares made in connection to Cisne-ros’s right to counsel. And while some may disagree with that view of Cisneros’s testimony, it is a plausible conclusion based on the entire record of the hearing. See, e.g., Carrion v. Smith, 549 F.3d 583, 590 (2d Cir.2008) (discussing Fed.R.Evid. 406 and affirming district court reliance on testimony of “established practice” in making findings of fact).
B. Alternatively, Remand Is Usually Required to Address a Lack of Factual Findings
Even if we were to decide the district court did not make an explicit factual finding deemed somehow necessary, an appellate court is “not in the business of making findings of fact.” Forest Grove Sch. Dist. v. T.A., 638 F.3d 1234, 1238 (9th Cir.2011). In fact, according to the Supreme Court, when a district court has not made the necessary findings of fact, “the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings.” Pullman-Standard v. Swint, 456 U.S. 273, 291-92, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). “The only exception to this rule is when the record permits only one resolution of the factual issue.” Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387 n. 3, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008). As previously stated, my reading of the record compels the conclusion that the district court found Cisneros did not testify truthfully. Therefore, remand rather than appellate fact finding is the only course.
The majority offers two reasons for not remanding. First, the district judge who *765 conducted the evidentiary hearing has since retired and, second, an appellate court must accept as true any statement offered by a witness which is not directly contradicted. The second reason cannot be right, and I am not aware of any law requiring a district court accept all testimony as credible. And as for the first reason, the majority posits the “district judge assigned the case on remand would be in no better position than we are to decide the factual question.” That is also an incorrect appellate standard of review. On remand, a different district judge may opt to take additional evidence, such as additional testimony from Cisneros and Linares.[1] The district judge on remand may also seek additional documents which could either support or undermine Cisneros’s allegations. Simply, credibility is impossible to judge on appeal — on the paper record. The demeanor of witnesses is a critical advantage of the district court judge but not appellate judges. Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (“As with the state of mind of a juror, evaluation of the prosecutor’s state of mind based on demeanor and credibility lies ‘peculiarly within a trial judge’s province.’ ”). And of course, it is not unheard of for a case to be assigned to a new district judge on remand. The fact that this particular district judge is no longer available to hear the case cannot support our foray into appellate fact finding.
II. Prejudice
Even assuming Agent Linares told Cisneros an attorney would not be able to help her, Cisneros has not shown she experienced prejudice from that statement.[2] It is not plausible that, absent this comment by Linares, Cisneros would have been able to convince ICE to convert her removal from administrative to non-administrative proceedings. Second, it is not plausible, had she been able to stay her removal, that she would have been granted a U-visa and avoided deportation.
A. Cisneros Could Not Have Avoided Administrative Removal
Once Cisneros was convicted of aggravated felonies in June 2009, the Notice for administrative proceedings was approved in October 2009, and the Notice was served in May 2010, Cisneros’s options for challenging her administrative removal were, by statute and case law, extremely limited. The type of relief Cisneros claims she could have sought and the type of relief the majority holds she might have obtained (i.e. a U-visa) is implausible. A relatively detailed examination of administrative removal proceedings proves the point.
*766 Under 8 U.S.C. § 1228(b), the Attorney General has discretion to remove non-Legal Permanent Residents convicted of aggravated felonies through either regular or administrative proceedings. Cisneros concedes she had been convicted of an aggravated felony. Accordingly, the record before the court establishes Cisneros was eligible to be removed through administrative proceedings.
Administrative removal proceedings commence when an ICE agent serves a deportable person with a Notice of Intent to Issue a Final Order of Administrative Removal. 8 C.F.R. § 238.1(b)(2)(i). After proceedings commence, the deportable alien may challenge her placement in administrative rather than regular proceedings, but only on very limited grounds. Thus, the majority is correct that “an ICE agent can take an undocumented alien already put in administrative removal proceedings out of those proceedings and put her into removal proceedings before an Immigration Judge.” But contrary to the majority’s representation, it is not as simple as an ICE agent making this discretionary decision. Instead, a regulation makes clear how and when transfer out of administrative proceedings into regular proceeding is appropriate. According to 8 C.F.R. § 238.1(b)-(d), an ICE agent may transfer a non-citizen whose administrative removal proceeding has begun to non-administrative proceedings if the non-citizen “rebut[s] the allegations supporting the charge” and, upon examination of the evidence, the agent concludes the non-citizen is “not amenable to [administrative] removal.” See 8 C.F.R. § 238.1(b)-(d). Cisneros has not asserted either of these grounds. Therefore, Cisneros has not identified a plausible or even a possible way she could have been transferred out of the administrative proceedings.
B. Non-Citizens Cannot Obtain U-Visas While in Administrative Proceedings
Given that Cisneros was properly in administrative proceedings and has not identified any possible way she could have been transferred out of administrative proceedings, she was barred from obtaining any form of discretionary relief while in those proceedings. Under the language of § 1228(b)(5), Cisneros was statutorily barred from obtaining discretionary relief while in administrative proceedings. I agree with the majority that non-citizens who have been convicted of aggravated felonies are not automatically barred from applying for or obtaining a U-visa. United States v. Alvarado-Pineda, 774 F.3d 1198, 1201-1202 (9th Cir.2014). (citing 8 U.S.C. § 1101(a)(15)(T)). But a non-citizen who is prima facie eligible for a U-visa and has been convicted of an aggravated felony may only obtain discretionary relief (e.g. a waiver of inadmissibility and U-visa) outside of administrative removal proceedings, for instance, when as mentioned in Alvarado-Pineda, the alien seeks admission to the U.S. from another country. See Alvarado-Pineda, 774 F.3d at 1201-1202 (discussing waiver and U-visa as forms of relief from which aggravated felons are not barred when applying for admission to the U.S.). In sum, the majority is incorrect that Cisneros could have obtained a U-visa after service of the Notice of Intent to Issue a Final Order of Administrative Removal but before the issuance of the actual Final Order of Administrative Removal — in other words, while she was in administrative removal proceedings.
The Ninth Circuit has explicitly recognized the bar on discretionary relief for non-citizens in administrative removal proceedings on at least two occasions. In United States v. Calderon-Segura, 512 *767 F.3d 1104, 1108 (9th Cir.2008), the court held that once placed in administrative proceedings, “a non-[Legal Permanent Resident] aggravated felon subject to expedited removal [is] statutorily ineligible for any discretionary relief.” Second, in United States v. Reyes-Bonilla, 671 F.3d 1036, 1050 (9th Cir.2012), it was held an individual “could not receive any discretionary relief from removal because he had been placed in [administrative] proceedings based on his felony convictions.” See also United States v. Garcia-Martinez, 228 F.3d 956, 964 (9th Cir.2000) (holding “deportation was a foregone conclusion” for alien who did not challenge his conviction for an aggravated felony).
In Reyes-Bonilla, the court concluded the defendant’s “status as an aggravated felon” meant “the only form of immigration relief available to [him] was deferral of removal under CAT.” Reyes-Bonilla, 671 F.3d at 1050. The majority attempts to read into this a qualification to the bar against discretionary relief in administrative proceedings. But this is a misunderstanding of Reyes-Bonilla. The majority states Reyes-Bonilla “did not treat the fact that the defendant had been placed into administrative proceedings as a bar to all relief from removal, notwithstanding the text of § 1228(b)(5).” That is correct, but the majority is confusing discretionary and mandatory types of relief. CAT relief is not discretionary, it is mandatory. Reyes-Bonilla, 671 F.3d at 1050. Thus, the fact that § 1228(b)(5) did not bar potential, mandatory CAT relief in Reyes-Bonilla has no bearing on whether that statute bars discretionary forms of relief, such as waivers of inadmissibility and U-visas.
Overall, the majority ignores the law that created the one-two punch of an aggravated felony conviction coupled with placement in administrative removal proceedings. The majority maintains that because such convictions do not absolutely bar U-visa eligibility, Cisneros could have applied for and received a U-visa even while she was engaged in administrative removal. In reaching this conclusion, the majority relies upon a 2009 DHS policy under which it claims ICE vowed to stay administrative removal proceedings if there were a pending U-visa petition. See Memorandum from Peter S. Vincent, Principal Legal Advisor, U.S. Immigration & Customs Enforcement to the Office of the Principal Legal Advisor (Sept. 25, 2009), available at http://Lusa.gov/lGqVkYK. But the majority misreads the policy. The policy does not provide for stays of active administrative removal proceedings. Instead, it provides that ICE will stay regular removal proceedings, final orders of removal (resulting from regular proceedings), and final orders of administrative removal (resulting from administrative proceedings).
C. Cisneros Might Have Applied for a U-Visa and Stay of Deportation After Her Removal Proceedings Closed
The complicated journey through administrative proceedings and the statutory bar of § 1228(b)(5) shows the flaws in the majority’s analysis. But there is a more convincing argument, which neither the majority nor Cisneros pursue and which created a possibility of skirting the bar of § 1228(b)(5).
Had Cisneros been advised and obtained an attorney after receiving the Notice of Intent to Issue a Final Order of Administrative Removal, her attorney could have filed a U-visa petition on her behalf and, after receiving a Final Order of Administrative Removal (“FARO”), could have applied for a stay of her deportation pending a determination of the U-visa petition. *768 The possibility of applying for a stay of deportation is provided not only in ICE policy, but in regulation: “The filing of a petition for U-l nonimmigrant status has no effect on ICE’s authority to execute a final order, although the alien may file a request for a stay of removal pursuant to 8 CFR 241.6(a) and 8 CFR 1241.6(a).” 8 C.F.R. §§ 214.14(c)(1)(h). Section 241.6(a) states: “[The district director may,] in his or her discretion and in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act, [ ]grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate.” And § 212.5(b) includes “urgent humanitarian reasons” or “significant public benefit.” 8 C.F.R. 212.5(b).
In sum, the majority’s contention that an attorney could have persuaded ICE to transfer Cisneros out of administrative proceedings or stay her administrative proceedings is erroneous. But no doubt an attorney might have helped Cisneros avoid immediate deportation by filing a U-visa application and an accompanying motion to stay her deportation. This approach, however, is not addressed by the majority nor has Cisneros provided any meaningful briefing on this strategy.[3]
Thus, the best scenario for Cisneros, assuming she had not waived her right to counsel, would have been to obtain an attorney subsequent to her meeting with Agent Linares, then to have immediately met with the attorney who would have had to file applications for a waiver of inadmissibility and a U-Visa, and moved for a stay of her deportation pending their resolution, and finally, to hope the stay were granted. Cisneros has not presented any coherent argument that this sequence of events was plausible. But even assuming it were, Cisneros still has not shown it was plausible that after receiving a stay of her deportation she would have been granted a U-visa and avoided removal.
D. Cisneros Has Not Shown She Plausibly Would Have Been Granted a U-Visa
The majority relies heavily on an alleged general U-visa approval rate of seventy percent in determining Cisneros had a plausible chance of being granted a U-visa. But this statistic does not account for many possible variables among petitioners, including criminal histories, particularly for aggravated felonies.
The rejection by this circuit of general statistics as a means of proving plausibility is embedded in case law. United States v. Corrales-Beltran, 192 F.3d 1311, 1318 (9th Cir.1999) (“[An alien] must make a plausible showing that the Attorney General would have exercised discretion in his favor because of the unique circumstances of his own case.”). In Corrales-Beltran, the court held even a general statistic showing discretionary relief was granted fifty percent of the time was insufficient to show such relief was plausible with respect to a specific individual with a unique set of circumstances. Instead, the court held, “it would be sheer speculation to conclude, without more, that [the] appeal would have been successful.” Id. In United States v. Barajas-Alvarado, the Ninth Circuit held: “[T]o show ‘plausible grounds’ for relief, an alien must show that ... based on the ‘unique circumstances of [the alien’s] own case,’ it was plausible (not merely conceivable) that the [Immigration Judge] would have exercised his discretion in the alien’s favor.” 655 F.3d 1077,1089 (9th Cir.2011). The clear message of these cases is that general statistics are of little help to the *769 court in determining the plausibility of relief for non-citizens challenging their removal. The majority does not explain why a global seventy percent approval rate would make it plausible for individual relief when the court has previously held a fifty percent general approval rate does not.
This is problematic for another reason. The numbers from which it was calculated are open to several alternative, equally possible interpretations. See Number of 1-918 Petitions for U Nonimmigrant Status (Victims of Certain Criminal Activities and Family Members) by Fiscal Year, Quarter, and Case Status 2009-2015, U.S. Citizenship & Immigration Services, available at http://Lusa.gov/18LyQG3.[4] The majority arrived at the seventy percent statistic by dividing the number of petitions approved and denied in 2010 by the number approved [ (10,073/14,420) x 100=69.85%]. But, at the end of 2009, 11,863 petitions were pending. In 2010, 10,742 more petitions were submitted. Out of the 22,605 pending petitions in 2010, 10,073 were approved. By that estimate, the approval rate was forty-five percent. Furthermore, it is unclear from the chart when the petitions in each category (approved, denied, pending) were submitted. For example, petitions approved in 2010 could have been hold-overs from those pending in 2009. Finally, the petitions pending in 2009 might have been submitted any time between 2000 (when the U-visa was created) and 2009. Therefore, while it is possible to derive a seventy percent approval rate from analyzing a particular year, it is unclear whether that accurately reflects the reality.
The marginal value of these statistics is further shown by the complete absence of any information about why individuals were approved or denied. We know that in evaluating applications for waivers of inadmissibility, USCIS considers “the number and severity of offenses of which the applicant has been convicted.” 8 C.F.R. § 212.17(b)(l)-(2). We do not know why Cisneros’s petition was denied but we do know that even without her conviction for reentry after deportation, she had a significant criminal history. The single difference between Cisneros’s theoretical U-visa petition before removal and the one she eventually filed is that she illegally reentered the U.S. after she had been deported. The majority appears to have concluded that merely her illegal reentry conviction defeated Cisneros’s application, not her lengthy criminal record, including convictions for possession for sale of methamphetamine. We have nothing in the record or law to support this assumption.
The majority explains that the overall approval rate for U-visas, coupled with Cisneros’s citizen family members, establishes it was plausible her U-visa application would have been approved. I do not understand the basis for this conclusion. Perhaps the majority means the overall seventy percent approval rate establishes, as a matter of law, that a U-visa was plausible. After all, if someone with a very substantial criminal record such as Cisneros always has a “plausible” case for a U-visa, it would be difficult to see which individuals would not. My impression is that the majority’s disregard of the seriousness of the Cisneros’s prior offenses is colored by the view that a co-defendant, Rodriguez, allegedly forced Cisneros to *770 sell methamphetamine. But Rodriguez was never convicted of this conduct. The only crime against Cisneros with which Rodriguez was charged was extortion while the two were incarcerated for their shared drug crime.[5] This prediction should not be based on unsubstantiated assumptions.
Determining the plausibility that a government agency mired in a web of complicated governing law would have granted a single petition over five years ago is difficult. But the party arguing plausibility, in this case Cisneros, always bears the burden of proof. And, despite the possibility that counsel theoretically might have submitted a U-visa petition and stayed Cisne-ros’s removal until the outcome of that petition, Cisneros has not met her burden of showing she had a plausible chance of being granted relief from removal. Therefore, I must dissent.

. Even though Cisneros has been deported, her counsel must continue to have contact with her, otherwise this appeal on her behalf would be improper. See Marrow v. United States, 772 F.2d 525, 530 (9th Cir.1985) (citing ABA Standards for Criminal Justice 4-8.2, 21-2.2 (2d ed. 1980)) ("The decision whether to appeal 'must be the defendant’s own choice’ ”); Dep’t of Water & Power of City of Los Angeles v. Anderson, 95 F.2d 577, 580 (9th Cir.1938) (stating appeal would be dismissed if it appeared attorneys appearing for appellant had no authority to conduct case for appellant). And while she may not be able to enter the country to testify, a district judge may permit her to offer testimony by telephone or videoconference. Cf. Maryland v. Craig, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (finding testimony via one-way video monitor did not violate confrontation clause).

. It is worth noting Cisneros’s opening brief contained two short paragraphs on the issue of prejudice which stated only that Cisneros’s facial eligibility for a U-visa demonstrated she had plausible grounds for relief and, therefore, suffered prejudice.

. The regulations governing post-removal order stays were first brought to the court’s attention in a 28(j) letter submitted after the completion of appellate briefing.

. The statistics were not part of the record before the district court and were first submitted to this court in a 28(j) letter, even though they had been available for years pri- or. Furthermore, Cisneros’s 28(j) letter contained only raw data for U-visa petitions received, approved, denied, and pending during 2009 and 2010. The seventy percent approval rate was calculated by the majority, not Cisneros.

. In crediting Cisneros's testimony and her account of coercion, the majority also mis-characterizes or disregards the underlying facts. The majority states, in 2006, Cisneros reported to police that Rodriguez had stolen her car. But Cisneros testified at Rodriguez’s extortion hearing that she had never filed a police report regarding the stolen vehicle. Rather, she stated the police had come to her after her vehicle was discovered in connection with a crime involving stolen mail. At that point, despite testifying that she did not witness the crime or have any other substantial contact with or knowledge of Rodriguez, Cisneros said she told police Rodriguez had stolen her car and was responsible for the stolen mail. These facts cast serious doubt on whether we know the full story of Cisneros’s relationship with Rodriguez.